### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TOPIA TECHNOLOGY, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 21-1821-CJB |
| | ) |
| EGNYTE, INC., | ) |
| | ) |
| Defendant. | ) |

Kelly E. Farnan, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE; Mark Boland, Raja Saliba, Michael R. Dzwonczyk, Chidambaram S. Iyer, SUGHRUE MION, PLLC, Attorneys for Plaintiff.

Carl D. Neff, FISHERBROYLES, LLP, Wilmington, DE; Ryan T. Beard, FISHERBROYLES, LLP, Austin, TX; Christopher R. Kinkade, FISHERBROYLES, LLP, Princeton, NJ, Attorneys for Defendant.

**MEMORANDUM OPINION AND ORDER**

March 31, 2023
Wilmington, Delaware

*Christopher J. Burke*
**BURKE, United States Magistrate Judge**

As announced at the hearing on December 20, 2022, IT IS HEREBY ORDERED that Defendant Egnyte, Inc.'s ("Defendant" or "Egnyte") motion to dismiss (the "motion"), (D.I. 39), which argues that Plaintiff Topia Technology, Inc.'s ("Plaintiff" or "Topia") asserted United States Patent Nos. 9,143,561 (the "'561 patent"), 10,067,942 (the "'942 patent"), 10,289,607 (the "'607 patent"), 10,642,787 (the "'787 patent"), 10,754,823 (the "'823 patent") and 11,003,622 (the "'622 patent") are directed to non-patent-eligible subject matter pursuant to 35 U.S.C. § 101 ("Section 101"), is GRANTED-IN-PART and DENIED-IN-PART.

Defendant's motion was fully briefed as of September 6, 2022, (D.I. 17), and the Court received further submissions regarding Section 101-related questions and supplemental authority on December 8-13, 2022, (D.I. 60; D.I. 62; D.I. 63; D.I. 65). The Court carefully reviewed all submissions in connection with Defendant's motion, heard oral argument, and applied the relevant legal standards for review of this type of Section 101-related motion at the pleading stage, which it has previously set out in *Genedics, LLC v. Meta Co.*, Civil Action No. 17-1062-CJB, 2018 WL 3991474, at *2-5 (D. Del. Aug. 21, 2018).

The Court's Order is consistent with the bench ruling announced at the hearing on December 20, 2022,[1] pertinent excerpts of which follow:

> That brings us to our last case today, *Topia Technology, Inc., [v.] Egnyte, Inc.* It's Civil Action Number 21-1821-CJB. Defendant Egnyte, Inc., which I[ will] refer to as Defendant, has filed a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), which I[ will] refer to as the motion. With the motion, Defendant is asserting that the complaint should be dismissed because the patents-in-suit are subject-matter ineligible pursuant to Section 101.

---

[1] (*See* D.I. 68 (hereinafter, "Tr."))

At the outset, the Court will address a few procedural issues.

First, there are six patents-in-suit at issue in this case, which are all relevant to the motion. For ease of reference here today, I[ will] refer to each of the patents by the last three numbers of their respective [p]atent [n]umbers.

Second, although the motion is brought here pursuant to [Federal] Rule [of Civil Procedure] 12(c), the nature of the Court's analysis of that motion will not differ as compared to its analysis of the other motions it addressed today. That is because although those other motions were brought pursuant to Rule 12(b)(6), not Rule 12(c), the standard of review for [] Rule 12(c) for judgment on the pleadings is the same as that for deciding Rule 12(b)(6) motions.[2]

Third, Defendants asserted that [c]laim 1 in each of the . . . respective patents is representative of all the other claims of those patents for purposes of Section 101 analysis at issue here.[3] In its answering brief, Plaintiff Topia Technology, Inc., which I[ will] refer to as Plaintiff, never really contests that assertion. Although at one point in its briefing, Plaintiff makes a quick reference to the content of two dependent claims, that is, [c]laim 5 of the '942 patent and [c]laim 4 of the '607 patent,[4] it does so only to show why the content of those claims are similar in kind to the content of [c]laim 1 of those respective patents. The [United States Court of Appeals for the] Federal Circuit has held, as I[ have] noted, that Courts may treat a claim as representative if the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim.[5] In light of this, herein, the Court will primarily only address [c]laim 1 of each of the respective patents-in-suit, understanding for our purposes here that [c]laim 1 of the patent is representative of all the claims of that same patent.

Fourth, because each of the six patents are related, they largely share the same specification with only a few differences. Today,

---

[2]  *Kaavo Inc. v. Cognizant Tech. Sols. Corp.*, Civil Action No. 14-1192-LPS-CJB, Civil Action No. 14-1193-LPS-CJB, 2016 WL 476730, at *2 n.4 (D. Del. Feb. 5, 2016).

[3]  (D.I. 40 at 4-11)

[4]  (D.I. 45 at 11-12)

[5]  *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018).

3

when I make reference to the specification, unless [I] indicate otherwise, I[ will] be referring to the specification of the '561 patent. When I do so, it should be understood that the specifications of all five other patents are the same in th[at] respect, again unless I advise specifically to the contrary.

And fifth, for reasons that will become clearer shortly, I[ am] going to address the patents-in-suit in four distinct groupings, as the Court's decisions . . . will differ depending on which grouping of patents is at issue.

The first grouping I[ will] address is actually a grouping of one[:] the '561 patent. The patent is titled "Architecture for Management of Digital Files Across a Distributed Network."

In [s]tep 1, Defendant argues that this patent, and indeed all six patents-in-suit today, are directed to an abstract idea that Defendant refers to in similar, if slightly different terms, throughout the briefing. Defendant alternatively refers to this abstract idea as "storing and synchronizing versions of documents and other files" or "synchronizing multiple versions of a file across network computers" or "synchronizing document versions" or "automatically transferring modified files and information across multiple generic computer systems" or "automatically transferring modified electronic files to network devices."[6] I understand Defendant to treat each of these slightly different articulations of the abstract idea as carrying the same basic meaning. So for ease of reference, I[ will] utilize "synchronizing multiple versions of the file across network computers" as the shorthand for the abstract idea at issue here.

Plaintiff, for its part, does[ not] dispute that synchronizing multiple versions of a file across network computers is an abstract idea, and the Court agrees that it is. Again, in the parlance of the Federal Circuit, it appears to be a disembodied concept or a basic building block of human ingenuity untethered from any real-world application.[7]

Plaintiff contends at [s]tep 1, however, that the claims of the '561 patent are directed not to the abstract idea but, instead, are "directed to a specific computer network architecture for a useful

---

[6] (D.I. 40 at 2, 15-16)

[7] *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1286 (Fed. Cir. 2013) (Lourie, J., concurring).

and improved file management system that includes a dedicated software system configured to automatically provide the user with the most recent version of the file to be accessed from any of the user's devices."[8] Plaintiff contends that the claims of all the patents are directed to that more specific concept. Plaintiff goes on to address what each patent is individually directed to more specifically in light of the specification.

As I noted earlier today, in order to determine what a claim really is directed to, the Federal Circuit explained that the Court should consult both the claim language and the specification. In doing so, it becomes clear that [c]laim 1 of the '561 patent is directed to the abstract idea at issue.

Turning first to the text of [c]laim 1, it does seem that the focus of that claim is on a high-level concept of synchronizing multiple versions of a file across network computers.[9] Nearly the entirety of the claim's text could be said to be devoted to this general concept. The claim explains that, first, the system requires the use of a first electronic device, a second electronic device, and a third electronic device, each associated with a user. Each of those three devices must contain an application. The claim then explains how the second device's application [1] automatically transfers a copy of the first electronic file from the second device to the first device at the point where the user modified the content of that first file and [2] how it does so upon determining that a save operation has been performed on the file. Next, the claim explains that the first device is also configured to automatically receive a copy of a second electronic file from a third device's application at the point when the user modifies the content of that file. Then the claim notes that the first device's application is configured to automatically transfer the modified version of the copy of the first file to the third device in order to replace an older version of that file. And the claim also states that the fist device automatically transfers a copy of the second file to the second device in order to replace an older version of that file.

Simply by laying out how [c]laim 1 describes the claimed system, one can see that the focus of nearly the entire claim is on the concept of automatically transferring computer files from one electronic device to another so that the respective three devices all contain the same modified and updated versions of those files. Put

---

[8]    (D.I. 45 at 4)

[9]    ('561 patent, cols. 10:45-11:9)

5

differently, the claim reads as if it is all about the abstract idea at issue[—]synchronizing multiple versions of a file across network computers[—]and not on some more specific or particularized real-world application of that idea. As Defendant notes, the claim[] uses "highly generalized, result-oriented terms[;]" [i]ts focus seems to be not on explaining in any detail *how* these file transfers are to be accomplished, but instead simply conveying the "aspirational result of automatically transferring updated versions" of the file in the first place.[10]

The specification only further supports this conclusion.

The [A]bstract and the [S]ummary of the [I]nvention section of the patent[11] describe what the patent is said to be all about. In doing so, those sections simply parrot back the content of [c]laim 1, nothing more.

The content [of the B]ackground of the [I]nvention section also supports Defendant's position. Therein, the patentee explained the problems in the prior art that the patent [means] to solve. Here, the patent notes that conventional computing systems allow for users' various devices to be easily connected, but that such systems had drawbacks in that "they do not provide the customer a seamless environment" in that "the customer must manually handle many aspects of that connection[]" [a]nd th[at] as to file management, customers must "manually move files between their devices" using various protocols.[12] The patent further expounds on these problems, which include [1] the proliferation of redundant file copies, [2] the proliferation of an error-prone environment, and [3] unnecessary complexity.[13]

The patent then describes a number of possible solutions in the art to this problem that, for one reason or another, are not satisfactory. These include remote desktop software [(]which is problematic because it [did] not [] utilize the local resources of a client [device)]; distributed file systems [(] which have drawbacks, including that the customer always had to be connected to the

---

[10]   (D.I. 40 at 15)

[11]   ('561 patent at 1 & col. 3:42-61)

[12]   (*Id.*, col. 1:31-36; *see also id.*, col. 1:59-62)

[13]   (*Id.*, col. 1:38-58)

system and that accessing files in the system tended to be a slow process[)]; FTP [(] which in addition to sharing some of the same problems as distributed file systems also had the problem that the customer was required to manually use client software to perform the operations of a distributed file system as a separate task[)]; e-mail [(]which was "even worse than FTP because the process is even more manual" [in that,] among other reasons[,] the customer has [to] find an e-mail message containing a file before [he] can [even] access the file[)]; and flash drives or external disk drives [(]which had the downside that they had to be "physically connected to the computer on which the files would be accessed"[).][14]

In other words, in this portion of the specification, the patentee seems to be explaining that the claims are meant to allow for *automatically* transferring computer files between devices, which was an improvement over the art because at least certain of these prior art options [] require the user to perform a [similar] solution *manually* in a more burdensome way.  However, the Federal Circuit has made clear that the mere automation of otherwise manual processes using generic computers does not constitute a patentable improvement in computer technology.[15]  In *The University of Florida Research Foundation, Inc. [v.] General Electric, Inc.,* for example, the Federal Circuit noted that when a patent's claims simply seek to automate an otherwise manual methodology in order to conserve human resources and minimize errors, this demonstrates that the patent is a "quintessential 'do it on a computer' patent[,]" [whose] claims are directed to an abstract idea.[16]

Moreover, it would seem hard for the [P]laintiff to contest that [c]laim 1 of the '561 patent is directed to merely automatically synchronizing multiple versions of the file across network computers[,] because in its [C]omplaint, Plaintiff essentially said as much.  There, Plaintiff stated that the '561 patent is "generally

---

[14]   (*Id.*, cols. 2:10-3:34)

[15]   *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed Cir. 2017).

[16]   *Univ. of Fla. Research Found., Inc. v. General Elec. Co.*, 916 F.3d 1363, 1367 (Fed. Cir. 2019) (citation omitted); *see also Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1315-16 (Fed. Cir. 2019) (finding claims directed to the idea of "capturing and transmitting data from one device to another" to be patent ineligible, and rejecting the patentee's argument that the claims recited technological improvements where the claims merely automated the process of data transfer).

directed to systems and methods for sharing electronic files between multiple devices, for even when a user modifies an electronic file on a device, a copy of the modified electronic file is automatically transferred to at least one other device."[17] The Court is hard-pressed to see much daylight between that description and Defendant's articulation of the abstract idea at issue here.

I now turn to [s]tep 2 of the *Alice* framework. As I noted earlier, at [s]tep 2 the Court is required to assess what else is in the claim beyond the abstract idea and whether those additional elements can amount to an ["]inventive concept,["] such that they transform the nature of the claim into a patent-eligible application of the abstract idea.

Here, however, it[ is] hard to see what more there is in [c]laim 1 of this patent beyond those things that relate to the abstract idea itself. All or nearly all of the claim's language seems to be focused on the general concept of automatically transferring modified electronic files between network devices[.]  [A]nd Plaintiff did not add allegations to its [C]omplaint that address[] the [Section] 101 question at [s]tep 2 in a manner that might suggest otherwise.

Nor is there anything about any hardware [(]such as the respective devices referenced by [c]laim 1[,] or the nature of the computer system itself[)], or any software [(]such as the claimed files or applications in the claims[)], that appear to amount to the inventive concept here.  The patent, as Defendant noted, makes clear that exemplary systems for implementing the invention simply include a "general purpose computing device"[18] and that "[e]mbodiments of the invention are operational with numerous other general purpose or special purpose computing system environments or configurations."[19]

In support of its argument for patent eligibility, Plaintiff argued in part that the claim does not preempt the field of synchronizing electronic files across multiple systems[,][20] because the patent, as I[ have] already discussed, distinguishes between the system in

---

[17]    (D.I. 1 at ¶ 12)

[18]    ('561 patent, col. 5:15-16)

[19]    (*Id.*, col. 4:57-59; *see also* D.I. 45 at 5)

[20]    (D.I. 45 at 16)

8

[c]laim 1 and other conventional approaches, at least some of which tended to rely on the user's *manual* work in order to update the respective files.[21] Since there remain available alternatives, according to the [P]laintiff, the "claims do not preempt every application of the alleged abstract idea."[22] The problem, however, for Plaintiff here as it relates to the '561 patent particularly is that in order to survive at [s]tep 2, a plaintiff cannot simply rely on generic computer elements to carry out an abstract idea ["]automatically.["] If a claim's only inventive concept is the application of an abstract idea using conventional and well-understood techniques, the claim has simply not been transformed into a patent-eligible application of an abstract idea.[23] As the Federal Circuit has noted, where a patent's claims are deemed only to disclose patent-ineligible subject matter under the *Alice* frame[]work, as they are as to this patent, preemption[] concerns are fully addressed and made moot.[24]

Plaintiff additionally argues in [s]tep 2 that prior to 2007, there "was no computer network architecture using a server between different user devices to perform automatic file synchronization whenever a user modifies a file on a device associated with a file management system."[25] But in the Court's view, that[ is] simply another way of saying the claimed system was new in the relevant time frame. As the Federal Circuit has noted, eligibility and novelty are separate inquiries. Simply because the claimed system may have been novel does not mean that it will survive *Alice's* test.[26]

Finally, the Court takes a moment to address some of the cases cited by both sides. First, the Court agrees with Defendant that the '561 patent is similar to the claims at issue in *Ameranth, Inc. [v.]Domino's Pizza,* a Federal Circuit case [and] a case the [D]efendant called out as the most similar to the challenged

---

[21]   (*Id.*)

[22]   (*Id.*)

[23]   *BSC Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290-91 (Fed. Cir. 2018).

[24]   *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1339 (Fed. Cir. 2017).

[25]   (D.I. 45 at 19)

[26]   *Two-Way Media Ltd.*, 874 F.3d at 1339-40.

9

conduct here.  In that case, the Federal Circuit found th[e] claims[,] which were directed to ["]configuring and transmitting hospitality-menu-related information using a system that[ is] capable of synchronous communications and automatic format[ting"] were directed to an abstract idea at [s]tep 1, in part because the claims provided only result-focused and functional language[,] without setting out the *specifics* of a particular conception [of how to] actually carr[y] out th[at] concept.[27]  At [s]tep 2, the Federal Circuit concluded that the claims did not include an inventive concept because they did no more than "instruct the practitioner to implement the abstract idea, which was routine, conventional activity."[28]  As I[ have] just described, the representative claim of the '561 patent seems just like the representative claims in *Ameranth*.  It relies on routine computer elements [] to simply carry out the abstract idea at issue.

Plaintiff, in identifying what it thought was the most analogous case in [its] supplemental letter brief, actually picked [a] case that it had not cited in its [earlier] briefing[,] and [that] instead [had been decided] after the briefing closed[:]  *Cooperative Entertainment [v.] Kollective Technology, Inc.,* another Federal Circuit case.[29]  Ironically, the Court concludes that this case is, in fact, as to the '561 patent, more helpful for Defendant than it is for Plaintiff.  In *Cooperative Entertainment*, the district court had ruled that the claims in the patent at issue were directed to the abstract idea of the preparation and transmission of content to peers through a computer network.[30]  The Federal Circuit reversed, concluding at [s]tep 2 that the claims could contain inventive concepts.  This is because the claims did more than merely implement the abstract idea with generic computer components using conventional technology.[31]  Importantly, unlike as to the '561 patent here, there was evidence in the record in *Cooperative Entertainment* to support that conclusion.  The *Cooperative Entertainment* Court found there were at least two limitations in the claims[ (]one that required a dynamic peer-to-peer network

---

[27]    *Ameranth, Inc. v. Domino's Pizza, LLC*, 792 Fed App'x 780, 786-87 (Fed. Cir. 2019).

[28]    *Id.* at 787.

[29]    (D.I. 62 at 1)

[30]    *Coop. Entm't, Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 131 (Fed. Cir. 2022).

[31]    *Id.*

10

wherein multiple nodes consume[d] the same content and were configured to communicate outside [of] content distribution networks, and another that required the use of trace routes in content segmentation[)] that potentially amounted to inventive concepts[.] [A]nd the Court explained how the specification and the operative complaint discussed these limitations in significant detail, articulating how their inclusion of the claims amounted to an improvement to the computer technology that was in the prior art.[32] Here, while the specification does discuss how the claimed invention amounts to an improvement over the prior [] art, the claimed content [at] issue involves only the use of generic and conventional computer components, it seems, to effectuate the abstract idea contained in the claims. There[ is] no showing here in the patent or in the operative complaint that anything in [c]laim 1 amounts to the [requisite] inventive concept.

For all these reasons, the Court finds that the motion should be granted as to the claims relating to the '561 patent.

The Court now turns to the second grouping, again a grouping of one[:] the '942 patent. The '942 patent, whose title is the same as the '561 patent, is otherwise also very similar to the '561 patent. The only identified key difference between the two as described by Plaintiff in [its] answering brief on pages 4 and 11[,][33] is the fact that [c]laim 1 of the '942 patent additionally requires that the claimed systems determine[] whether the respective devices are in communication with each other before sending an electronic file from one device to the other.[34] Claim 5, which ultimately depends from [c]laim 1, relatedly requires that the modified first file is ["]stored on [the] memory device associated with the first electronic device responsive to a determination that the first electronic device is not in communication with the third electronic device.["][35] For ease of reference, I[ will] refer to these claim limitations as the ["]determining["] steps []or elements.

Claim 1 of the '942 patent does not appear materially different to the Court from a Section 101 perspective as compared to [c]laim 1

---

[32] *Id.* at 131-35.

[33] (D.I. 45 at 4, 11)

[34] ('942 patent, col. 11:3-9)

[35] (*Id.*, col. 11:59-63)

of the '561 patent. Indeed, I note that on page 17 of Plaintiff's answering brief, Plaintiff lumped together these two patents for purposes of its eligibility analysis.[36]

Plaintiff nevertheless argues that the determining steps are features that are "additional non[-]abstract improvements" as they "are necessarily rooted in computer technology because they focus on addressing computer[ ]network[-]centric issues related to []network unavailability."[37] The rem[a]inder of Plaintiff's [s]tep 1 argument, however, simply restates the wording of the elements recited in [c]laims 1 and 5 that I[ have] just described.[38]

While the claim[ed] determining steps in the '942 patent do involve the use of computer technology, that bare fact alone does not require that the outcome of the eligibility analysis be any different.

At [s]tep 1, plaintiff has pointed to nothing in the '942 patent suggesting that these determining steps are actually what the claims are directed to. The '942 patent specification, including the [A]bstract and the [S]ummary of the [I]nvention section, are essentially the same as that of the '561 patent. And while the [A]bstract and [S]ummary of the [I]nvention section of the patent do note that the devices in the claimed invention are "in communication" with each other, they never suggest the step of *determining whether such communication exists* is central to the focus of the patent or its claims.[39]

Moreover, the concept that two devices actually must be in communication with each other before one transfers an electronic file to the other appears to the Court to be one that is fairly considered to be part of the abstract idea itself. After all, one cannot synchronize multiple versions of a file across network computers if those computers are[ not] in communication with each other in the first place.

As for [s]tep 2, Plaintiff did not make any arguments there that were specific to the '942 patent's determining steps. There[ is] nothing in the record to suggest that the inclusion of the steps

---

[36]    (D.I. 45 at 17)

[37]    (*Id*. at 11)

[38]    (*Id.*)

[39]    ('942 patent at 1 & col. 3:50-4:2)

12

would transform [c]laim 1 into one amounting to the unconventional use of technology to solve a problem in the computer arts[,] such that the steps would help make up an inventive concept.

Thus, for the same reasons as the '561 patent, the Court concludes that the '942 patent is also directed to patent-ineligible subject matter. The motion should be granted as to the claims relating to that patent as well.

The next grouping of patents I[ will] discuss are the '787 and '823 patents. Claim 1 of these patents is similar to [c]laim 1 of the '561 [p]atent[,] in the sense that all are claims to systems that automatically transfer files between multiple devices after a user modifies those files[.] [B]ut the respective claims also have some differences which, in the Court's view, will turn out to be material.

Specifically, [c]laim 1 of the '787 patent additionally requires that after a user modifies an electronic file on a device, the first metadata associated with that file must be assigned a first priority that is greater than a second priority assigned to the copy of the file itself. And the claim requires that, based on the fact that this metadata has a higher priority than a copy of the file itself, the metadata is automatically transferred from a first device to a second device before the copy of that file is transferred to the second device. Moreover, the claim requires that when this metadata is transferred to the second device, this causes a file representation of the file on that second device to be updated based on that metadata. And it requires that this now-updated file representation represents the updated version of the file stored on the first device that is not currently stored on the second device.[40]

As for [c]laim 1 of the '823 patent, it has similar language to [c]laim 1 of the '787 patent[,] except that the transfer of the metadata to the second device causes a graphical availability indication of the updated version of the file to be presented on the second device based on that metadata[,] and that this graphical availability indication is presented proximate to the file icon representing that file. And the claim requires that the graphical availability indication indicates that the updated version of the file is available to be downloaded to the second device.[41]

---

[40] (D.I. 1 at ¶ 55; *see also* '787 patent, col. 11:09-55)

[41] (D.I. 1 at ¶ 67; *see also* '823 patent, col. 11:10-61)

13

At [s]tep 1, the Court does [not] think it[ is] correct as a legal matter to conclude that these two patents are directed simply to the bare abstract idea that Defendant has put forward. The Court so concludes for a few reasons.

First, Defendant's proposed abstract idea[ (]again, synchronizing multiple versions of the file across network computers[)] does not include a concept that seems key to these patents, that is, that certain metadata related to the file must get transferred to the device *before* the copy of the electronic file gets transferred to the device. A significant portion of [c]laim 1 of both the patents discuss this requirement and how this transferred metadata and this prioritization over the file copy itself otherwise impacts the synchronization process. Surely one could synchronize multiple versions of a file across network computers *without* utilizing this type of prioritized metadata process. So this metadata-related aspect of the claims has to be viewed as something narrower [than] and really distinct from the broad abstract idea itself.

Moreover, these two patents provide a number of other clues that whatever the claims are directed to, that concept has to include reference to the system's utilization of prioritized metadata. For one thing, look at the patent titles. The title of the '787 patent is "Pre[-]File[-]Transfer Update Based on Prioritized Metadata." And the title of the '823 patent is "Pre[-]File Transfer Availability Indication Based on Prioritized Metadata." It is permissible to look at a patent's title in assessing what a claim is directed to,[42] and here the titles emphasize that you simply can[not] articulate what these patents are all about without including some reference to the claimed system and method's use of prioritized metadata. Despite this, Defendant's abstract idea does not mention this concept.

Additionally, the [A]bstract and [S]ummary of the [I]nvention sections of these two patents also support Plaintiff's position at [s]tep 1. Unlike with the other four patents-in-suit, these key sections of the '787 and '823 patents make prominent reference to the importance of the use of prioritized metadata in file synchronization.

[Now, a]s the Court will note in a moment, what these patents and other patents-in-suit are a little less clear about is exactly *how it is* that the use of the prioritized metadata actually helps to improve

---

[42] *Endo Pharm., Inc. v. Teva Pharm. USA, Inc.*, 919 F.3d 1347, 1353 (Fed. Cir. 2019).

computer functionality. There is some discussion of that, as I[ will] explain, though not a lot. Nevertheless, the [s]tep 1 inquiry asks what is the focus of these claims. Given that it[ is] clear that these two patents are focused in significant part on transferring metadata prior to the transfer of electronic files, the Court cannot conclude that the claims are simply directed to the much broader abstract idea of synchronization of multiple versions of the file across network devices.

So for that reason, the Court will deny Defendant's motion at [s]tep 1 as to the '787 and '823 patents.[43]

Finally, the Court turns to the last patent grouping, the '607 and '622 patents. These patents, which share the same title as the '561 patent, seem to fall somewhere between the '561 patent on the one hand and the '787 and '823 patents on the other as it relates to the Section 101 calculus.

Like the '787 and '823 patents, the '607 and '622 patents do include in their respective [c]laim 1s, among other things, the concept that metadata about a file must be transferred to a location prior to the transfer of the electronic file itself. For example, [c]laim 1 of the '607 [patent] is a system claim that requires after a user modifies an electronic file on a device first metadata is generated relating to the file. The system automatically transfers that metadata to a second device prior to the copy of the file being transferred to that same device.[44] And [c]laim 1 of the '622 patent has a similar requirement.[45]

Unlike the '787 and '823 patents, however, the title of the patent did not make reference to the claim's use of prioritized metadata with respect to file trans[fer]. Nor did the patent's [A]bstract or [S]ummary of the [I]nvention section[s] discuss this concept. Instead, the content of the '607 and '622 patent specification is essentially the same as the content of the '561 patent specification.

---

[43] *Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, Civil Action No. 17-1390-LPS-CJB, 2019 WL 4466766, at *10 (D. Del. Sept. 18, 2019) (stating that it is Defendant's burden to articulate an abstract idea that correctly characterizes the claim at issue and that failure to do so is a sufficient basis to deny the motion).

[44] (D.I. 1 at ¶ 44; *see also* '607 patent, cols. 10:59-11:25)

[45] (D.I. 1 at ¶ 77; *see also* '622 patent, cols. 10:60-11:24)

So at *Alice* [s]tep 1, although the claims of the '607 and '622 patents do seem to make some prominent use of prioritized metadata, it[ is] much more difficult to say here than it was as to the '787 and '823 patents that these claims are *directed to* a system that must include this concept.

In such a circumstance, where there[ is] a close call as to what a claim is directed to at [s]tep 1, the Federal Circuit noted in *Enfish [LLC v. Microsoft Corp.]*[46] that an analysis of whether there are arguably concrete improvements in the recited computer technology may better take place[] at [s]tep 2[.]  [S]o the Court will go that route here as to these two patents.

At [s]tep 2, however, the Court believes there is just enough in the record to suggest a plausible factual dispute about whether these patents in fact contain an inventive concept.  Therefore, for that reason, the Court will deny Defendant's motion as to the '607 and '622 patents.

More specifically, there is at least one portion of the patents' common specification that appears to discuss how this use of metadata can play a helpful role in solving the problems relating to file synchronization that are discussed in the patent.[47]  According to the specification, a common problem experienced by distributed file systems and FTP for example[—]two prior art options that the patent derides[—]was a "latency" problem.  That is, the delay "between a file being put onto a file system and its showing up on a remote machine."[48]  In explaining how the patent helps solve this problem, the specification notes that "[i]n an embodiment the user interfaces [] may include a list of the customer's documents and related metadata[,] as well as any one-to-one or one-to-many relationships between the documents and metadata"[49] and it describes how, for example, an "embodiment directory" [(]which the Court understands from Plaintiff's counsel's statements at oral argument to be a particular type of metadata[)] can be "decoupled from the [movement of] files" such that the "directory update system updates at a higher priority than the documents [to] be

---

[46]    822 F.3d 1327, 1339 (Fed. Cir. 2016).

[47]    (D.I. 45 at 13-14, 17-19)

[48]    ('561 patent, col. 8:61-64)

[49]    (*Id.*, col. 8:55-58)

16

synchronized."[50] Although the patent's language here is far from complete, the Court thinks it can see how the patent [] is describing how the prioritization of metadata over the file copy itself and the sending of that metadata to a device before the file copy is said to help overcome latency issues. Plaintiff's counsel explained today that one way that it does so is by alerting the user to a modification of a file more quickly prior to the file copy itself being received by the device.

Additionally, as I noted, at column 1 and 2, the patent describes negatively certain prior art file synchronization options. As I noted, among those are remote desktop software and distributed file systems. Today, Plaintiff's counsel argued that it may be correct to view those solutions as a type of automated or synchronized method of updating files across network devices. In other words, that those two solutions are other unclaimed approaches that can be taken in the realm of the abstract idea at issue. I can[not] say that Plaintiff is wrong to characterize these solutions as automated solutions in this way, so this could be some evidence that the claimed solution does not significantly preempt the field of the abstract idea, which would also relevant evidence at [s]tep 2.

Now, the Court acknowledges that the patent says little more about how the prioritization of metadata and the file synchronization process can amount to an inventive concept in the computer space[.] [B]ut this is the pleading stage. And in the Court's view, this record information is just sufficient to at least create a fact issue as to whether the '607 and '622 patents can meet [s]tep 2's requirement by way of their reliance on prioritized metadata in the claimed file transfer process.

Thus, for all the reasons that I[ have] set out, the Court finds the '561 and '942 patents are directed to patent-ineligible subject matter based on the record before me and will grant the motion based on those patents. The Court will otherwise deny the motion as to remainder of the patents[-]in[-]suit.

---

[50] (*Id.*, col. 8:64-67)