## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TOPIA TECHNOLOGY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 21-1821-CJB |
| | ) | |
| EGNYTE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

Kelly E. Farnan, Jessica E. Blau, RICHARDS, LAYTON & FINGER, PA, Wilmington, DE; Mark Boland, Raja N. Saliba, J. Warren Lytle, L. Roman Rachuba, Janvi U. Shah, SUGHRUE MION PLLC, Washington, D.C., Attorneys for Plaintiff Topia Technology, Inc.

Carl D. Neff, PIERSON FERDINAND LLP, Wilmington, DE; Armon Shahdadi, PIERSON FERDINAND LLP, Atlanta, GA; Christopher R. Kinkade, PIERSON FERDINAND LLP, Princeton, NJ; John T. Gutkoski, PIERSON FERDINAND LLP, Boston, MA; Ryan T. Beard, PIERSON FERDINAND LLP, Austin TX, Attorneys for Defendant Egnyte, Inc.

## **MEMORANDUM OPINION**

July 11, 2025
Wilmington, Delaware

*Christopher J. Burke*
**BURKE, United States Magistrate Judge**

In this action filed by Plaintiff Topia Technology, Inc. ("Topia" or "Plaintiff") against

Defendant Egnyte, Inc. ("Egnyte" or "Defendant"), Plaintiff alleges infringement of United

States Patent Nos. 10,289,607 (the "'607 patent"), 10,642,787 (the "'787 patent"), 10,754,823

(the "'823 patent") and 11,003,622 (the "'622 patent," and collectively, the "asserted patents" or

"patents-in-suit").[1]  Presently before the Court[2] is Defendant's Motion for Summary Judgment of

Non-infringement ("Motion") filed pursuant to Federal Rule of Civil Procedure 56.  (D.I. 351)

For the reasons set forth below, the Motion is GRANTED.

## I.      BACKGROUND

### A.      Procedural Background

Plaintiff commenced this action on December 27, 2021.  (D.I. 1)  The Court held a

*Markman* hearing on September 13, 2023.  (D.I. 160)  Between March 18, 2024 and April 17,

2024, the Court issued various orders regarding claim construction, certain of which will be

referenced herein.  (D.I. 236; D.I. 242-44; D.I. 246; D.I. 258-59)

---

[1]      Plaintiff originally also asserted infringement of United States Patent Nos.
9,143,561 (the "'561 patent") and 10,067,942 (the "'942 patent").  (D.I. 107)  But after the United
States Patent Trial and Appeal Board later issued Final Written Decisions finding the asserted
claims of those patents invalid, the parties agreed to stay the instant case without prejudice as to
any such claims, (D.I. 327; D.I. 329; D.I. 330; D.I. 352 at 2).  The '561 patent, the '942 patent
and the four asserted patents each belong to the same patent family and share substantially the
same specification.  (D.I. 86 at 2 n.1, 3 n.2; D.I. 352 at 2; Tr. at 185)  Therefore, below, the Court
will cite to the '607 patent to discuss issues relating to all of the asserted patents, unless
otherwise noted.

[2]      The parties have jointly consented to the Court's jurisdiction to conduct all
proceedings in these cases, including trial, the entry of final judgment and all post-trial
proceedings.  (D.I. 19)

Defendant filed the instant Motion on January 21, 2025—the same date that the parties each filed various other summary judgment and *Daubert* motions. (D.I. 351) The Motion was fully briefed as of March 18, 2025. (D.I. 423) The Court heard oral argument on the Motion on April 9, 2025. (D.I. 449 (hereinafter "Tr."))

### B.      Factual Background

As of the summary judgment stage of this case, Plaintiff is asserting infringement of claims 4-5, 7, 12, 17 and 19 of the '607 patent, claims 1-4 and 8 of the '787 patent, claims 1-2 and 8 of the '823 patent and claims 1-2 and 11 of the '622 patent (collectively, the "asserted claims"). (D.I. 352 at 2; D.I. 361, ex. 8 at 2) Plaintiff argues that Defendant infringes each of these asserted claims by developing, making, offering to sell and selling certain products with file synchronization functionalities that interact with and use Egnyte's Cloud as a central repository for customers' files, specifically, Defendant's Desktop Sync/Egnyte Drive/Desktop Client ("Desktop App") and its Smart Cache/HybridCloud/Turbo ("Storage Sync," and together with the Desktop App, the "accused products"). (*See, e.g.*, D.I. 361, ex. 9 at ¶¶ 137-39; D.I. 363, ex. 10 at ¶¶ 118-25)

The four patents-in-suit are generally directed to "automatic modification-triggered transfer of a file among two or more computer systems associated with a user." (*See, e.g.*, '607 patent, Abstract)[3] The inventions described therein are said to address the need for "file management across [a customer's work, home and/or personal] devices" without requiring the customer to manually move files between those devices. (*Id.*, col. 1:30-40)

---

[3]      The asserted patents, the '561 patent and the '942 patent are found in various places on the docket, including at D.I. 361, Exhibits 1-6. Hereafter, the Court will cite to these patents simply by their number.

One of the asserted bases for the Motion—the one the Court will discuss in this Memorandum Opinion—relates to the claim term "responsive to the user modifying a content"; the Court and the parties referred to this as "term 5" during the claim construction process. (*See* D.I. 259) This claim term can be found in all of the asserted claims (or in the independent claims upon which an asserted claim depends). (D.I. 86 at 3-4; *see also* D.I. 445 at 1-2)

At the hearing on the Motion, Defendant (without objection) proffered claim 1 of the '607 patent as being representative for purposes of assessing and resolving this portion of the instant Motion. (Tr. at 144)[4] The Court will therefore make reference to claim 1 of the '607 patent herein, with the understanding that the Court's analysis of the infringement issue as to that claim applies to all asserted claims. (*See also* D.I. 91 at 3 & n.5) The claim recites as follows:

> **1**. A system comprising:
>
> a server system comprising one or more processors programmed with computer program instructions that, when executed, cause the server system to:
>
> receive, over a network, a copy of a first file from a first client device associated with a user, wherein the copy of the first file is automatically received from the first client device *responsive to the user modifying a content* of the first file stored on the first client device, the copy of the first file being a version of the first file that is generated from the user modifying the content of the first file;
>
> receive, from the first client device, first metadata associated with the version of the first file that is generated from the user modifying the content of the first file, the first metadata being assigned a first priority greater than a second priority assigned to the copy of the first file;

---

[4]      Plaintiff also utilized claim 1 of the '787 patent to present the relevant issue at the hearing on the Motion. (Plaintiff's Summary Judgment Hearing Slides, Slide 13) Again, though, the relevant portion of claim language is substantially the same across all asserted patents. (Tr. at 144; *see* '607 patent, cols. 10:62-11:2, 12:27-34, 13:21-28, 14:13-20; '787 patent, cols. 11:13-20, 12:36-43; '823 patent, cols. 11:15-22, 12:44-51; '622 patent, cols. 10:64-11:4, 12:33-40)

> determine that the server system is not in communication with a
> second client device associated with the user;
>
> store the copy of the first file on the server system;
>
> automatically transfer the first metadata to the second client device
> based on the first priority being greater than the second priority
> such that the first metadata is transferred to the second client
> device prior to the copy of the first file being transferred to the
> second client device; and
>
> automatically transfer, over a network, the copy of the first file to
> the second client device associated with the user to replace an
> older version of the first file stored on the second client device,
> responsive to (i) resuming communication with the second client
> device and (ii) receiving the copy of the first file from the first
> client device.

('607 patent, cols. 10:58-11:25 (emphasis added))

After holding a *Markman* hearing, the Court construed "responsive to the user modifying a content" largely as Plaintiff had proposed:  i.e., to mean "referring to a condition of the user modifying a content as an initial triggering event for a corresponding recited action."  (D.I. 259)[5]

Additional facts relevant to resolution of the instant Motion will be discussed in Section III.

## II.     STANDARD OF REVIEW

### A.     Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

---

[5]     The Court also construed certain related terms—i.e., "automatically transferred . . . when the user modifies a content of the . . . file" and "automatically provided . . . when a content . . . is modified by the user," as used in the asserted claims, in line with a revised proposal from Plaintiff:  i.e., to mean "where the automatic synchronization is initiated by the user modifying the content of the file."  (D.I. 243)

R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986).  If the moving party has sufficiently demonstrated the absence of such a dispute, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial."  *Id*. at 587 (internal quotation marks, citation and emphasis omitted).  If the nonmoving party fails to make a sufficient showing in this regard, then the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  During this process, the Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

However, in order to defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.  The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  Facts that could alter the outcome are "material," and a factual dispute is "genuine," only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*. at 248.  "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted."  *Id*. at 249-50 (internal citations omitted).

A party asserting that a fact cannot be—or, alternatively, asserting that a fact is— genuinely disputed must support the assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or

declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A) & (B).

> **B.**      **Claim Construction**

The Court has often set out the relevant legal standards for claim construction, including in opinions addressing a motion for summary judgment; one such opinion was *Glaxo SmithKline LLC v. Glenmark Pharms. Inc., USA*, Civil Action No. 14-877-LPS-CJB, Civil Action No. 14-878-LPS-CJB, 2017 WL 8948972, at *3-4 (D. Del. May 24, 2017), *report and recommendation adopted,* 2017 WL 2493786 (D. Del. June 9, 2017).  The Court hereby incorporates by reference its discussion in *Glaxo SmithKline LLC* of these legal standards and will follow them herein.  To the extent consideration of the disputed terms here necessitates discussion of other, related legal principles, the Court will address those principles in Section III below.

> **C.**      **Patent Infringement**

The patent infringement analysis consists of two steps.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995).  First, the court must determine the meaning and scope of the patent claims asserted to be infringed.  *Id*.  Claim construction is generally a question of law, although subsidiary factfinding is sometimes necessary.  *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 326-27 (2015).  Second, the trier of fact must compare the properly construed claims to the allegedly infringing product.  *Markman*, 52 F.3d at 976.  This second step is a question of fact.  *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1319 (Fed. Cir. 2012).

"Literal infringement of a claim exists when every limitation recited in the claim is found in the accused device." *Kahn v. Gen. Motors Corp.*, 135 F.3d 1472, 1477 (Fed. Cir. 1998). If any claim limitation is absent from the accused product, there is no literal infringement as a matter of law. *Amgen Inc. v. F. Hoffman-La Roche Ltd*, 580 F.3d 1340, 1374 (Fed. Cir. 2009). The patent owner has the burden of proving infringement, and must do so by a preponderance of the evidence. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988).

When an accused infringer moves for summary judgment of non-infringement, such relief may be granted only if at least one limitation of the asserted claim does not read on an element of the accused product. *See Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1376 (Fed. Cir. 2005); *see also TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002) ("Summary judgment of noninfringement is [] appropriate where the patent owner's proof is deficient in meeting an essential part of the legal standard for infringement, because such failure will render all other facts immaterial."). Therefore, the court may grant summary judgment of non-infringement only if, after viewing the facts in the light most favorable to the non-movant, there is no genuine issue as to whether the accused product is covered by the claims, as construed by the Court. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999).

## III. DISCUSSION

In total, with its Motion, Defendant presented five arguments as to why it does not infringe the asserted claims; three of those bases applied to all of the accused products and would "dispose of the entire case" if granted (the "entirely dipositive arguments"). (D.I. 445 at 1-2; D.I. 352 at 1) As explained above, herein the Court needs only to take up one of the three

entirely dispositive arguments, which concerns whether Desktop App and Storage Sync practice the "responsive to the user modifying a content" limitation.[6]

As an initial matter, the Court addresses how to properly categorize this dispute. On that score, the Court's colloquy with the parties at oral argument made clear that the parties were, as an initial matter, having a disagreement about the meaning of claim scope—particularly, about what it means to be "*modifying* a content." (Tr. at 147-48 (Defendant's counsel noting that the parties were at odds about what this phrase "means[,]" in light of the intrinsic and extrinsic evidence); *id*. at 179 (Plaintiff's counsel agreeing that the parties are having a dispute about what the word "modifying" means, as it is used in the claims)) This is a dispute "over claim meaning, which the Court, rather than a jury, must resolve." *Cooper Notification, Inc. v. Twitter, Inc.*, 867 F. Supp. 2d 485, 491 (D. Del. 2012), *aff'd,* 545 F. App'x 959 (Fed. Cir. 2013); *see O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[c]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement") (internal quotation marks and citation omitted).

"Where the parties do not dispute any relevant facts regarding the accused product . . . but disagree over possible claim interpretations, the question of literal infringement collapses into claim construction and is amenable to summary judgment." *Gen. Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F.3d 978, 983 (Fed. Cir. 1997); *see MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1378 (Fed. Cir. 2007). As the Court will demonstrate below, that is our circumstance here.

---

[6]    Thus, although there were other bases proffered by Defendant in support of the instant Motion, herein when the Court refers to "the Motion" or to "resolving" the Motion, it will solely be referring to the basis that relates to the claim term "responsive to the user modifying a content."

And so in resolving the Motion, the Court will first construe the relevant claim language. Then it will proceed to assess whether there is any dispute of material fact regarding the accused products and/or the application of the proper construction to those products (explaining why there is not).

### A.      Claim Construction

In light of the Court's prior claim construction decisions, each of the asserted claims requires that the "initial triggering event" that starts the file synchronization process described therein occurs when the user is "modifying a content" of the first file that is stored on the first client device. (D.I. 259)  The instant claim construction dispute, as noted above, is about what it means for a user to be "*modifying* a content" of a file.

It would have been better if, as part of their briefing, the parties had written out their proposed constructions for "modifying a content" or "modifying" in a clear way (e.g., by using a chart like the below, or setting off their proposal via use of quotation marks).  But they didn't do that.  So below, the Court will articulate what those constructions were, guided by the arguments the parties made in their briefing and during oral argument:

| Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|------|-----------------------------------|-----------------------------------|
| "modifying a content" | "editing content of the file and saving that edited content to persistent storage" | "editing content of the file, which does not involve saving the file" |

(D.I. 352 at 13, 15, 17; D.I. 403 at 7-8; D.I. 423 at 8-10; Tr. at 139-40, 178-79)  In other words, the key dispute here is that:  (1) Plaintiff believes that in order for a user to have accomplished "modifying" a file, the edits the user makes to the file *must also be saved*; but (2) Defendant asserts that "modifying" a file *is completed when the user edits the file*—and that saving the file is a *separate step* that is *not* a part of the modification process.

For two primary reasons, the Court agrees with Defendant's position.

First, the guidance provided by a related patent in the same family—the '561 patent[7]—strongly indicates that Defendant is correct.  Claim 1 of the '561 patent recites as follows (with relevant language set off in italics):

> **1**. A system comprising:
>
> a first electronic device configured to selectively execute a first application, the first electronic device being in communication with a second electronic device and a third electronic device, each associated with a user wherein the first electronic device is configured to:
>
> receive from a second application executable on the second electronic device a copy of a first electronic file automatically transferred from the second application when the *user modifies a content of the first electronic file*; and
>
> wherein the first electronic device is further configured to receive from a third application executable on the third electronic device a copy of a second electronic file automatically transferred from the third application; when the user modifies a content of the second electronic file; and
>
> wherein the first application is further configured to automatically transfer the *modified first electronic file copy* to the third electronic device to replace an older version of the first electronic file stored on the third electronic device with the *modified first electronic file copy* having the content modified by the user; and
>
> automatically transfer the modified second electronic file copy to the second electronic device to replace an older version of the second electronic file stored on the second electronic device with the modified second electronic file copy having the content modified by the user;
>
> wherein the second application automatically transfers the copy of the *modified first electronic file* to the first electronic device upon

---

[7]    As was noted above, the '561 patent was originally asserted in this action.  *See supra* n.1.

> determining that a *save operation* has been performed *on the modified first electronic file*.

('561 patent, cols. 10:47-11:9 (emphasis added))

Case law from the United States Court of Appeals for the Federal Circuit instructs that, as a general matter, "different claim terms are presumed to have different meanings." *MicroStrategy Inc. v. Bus. Objects Ams.*, 238 F. App'x 605, 609 (Fed. Cir. 2007); *see also CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings."); *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006) ("the use of two terms in a claim requires that they connote different meanings") (emphasis omitted).  Further, the Federal Circuit has stated that it is presumed that "the same claim term in the same patent or related patents carries the same construed meaning" absent evidence suggesting otherwise, *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003), and that courts should "ordinarily interpret claims consistently across patents having the same specification[,]" *In re Katz Interactive Call Processing Pat. Litig.*, 639 F.3d 1303, 1325 (Fed. Cir. 2011).  (Tr. at 185; D.I. 352 at 15-16)

With this relevant law in mind, it is easy to see how the language in claim 1 of the '561 patent provides a strong clue that, when it comes to the instant invention, "modifying" and "saving" a file are two *separate and distinct* actions taken by a user.  (*See* Tr. at 141, 185-87) That claim makes use of a "modified first electronic file"—but it clearly states that a copy of this file is not automatically transferred to the first electronic device until it is determined that a "*save operation* has been performed *on* the *modified first electronic file*."  ('561 patent, col. 11:6-9 (emphasis added))  But if "modifying" a file necessarily included the concept of saving that file (as Plaintiff suggests here), then claim 1 of the '561 patent wouldn't make much sense.  Put

12

differently, were Plaintiff's proposed construction of "modifying" correct, it would seem

nonsensical to say that automatic transfer is to occur when a "save operation" is performed "*on*

the *modified* first electronic file"—because that save operation would *already* have been

performed *as part of the process of modifying* that very same file.  (Tr. at 186)  Therefore, the

doctrine of claim differentiation supports Defendant's position—and it indicates that Plaintiff's

proposed construction is not correct.  *See In re Rambus Inc.*, 694 F.3d 42, 48 (Fed. Cir. 2012)

(applying the doctrine of claim differentiation across related patents); *Forest Lab'ys, Inc. v. Teva*

*Pharms. USA, Inc.*, C.A. No. 14-121-LPS, 2016 WL 54910, at *8 (D. Del. Jan. 5, 2016)

(same), *aff'd,* 716 F. App'x 987 (Fed. Cir. 2017).

   Second, the common specification's few references to "saving" a file or a "save"

operation also help demonstrate that this saving process is something separate from the act of

modifying a file.  Perhaps the best example of this comes in a portion of column 8 of the '607

patent, which reads as follows:

> In operation, according to an embodiment, the user may open and
> *modify a file* . . . , such as a word-processing document or other
> electronic file.  Alternatively, the user may create a first instance of
> the file . . . .  The user may have previously associated, or may now
> associate, the file . . . with the transfer client . . . .  Upon a
> predetermined and user-configurable triggering event, the transfer
> client . . . transfers the *modified file* . . . , or a copy of the *modified*
> *file*, to the server . . . .  Such a triggering event may include, but be
> not limited to, the *user saving the file*, the elapsing of a
> predetermined amount of time during which the file has been
> opened, or the re-initiation of a communication session between
> the device . . . and the server . . . .

('607 patent, col. 8:29-41 (emphasis added) (*cited in* Plaintiff's Summary Judgment Hearing

Slides, Slide 13); *see also* Tr. at 181-82)  In the above excerpt, the specification is discussing

possible trigger events that will cause the system to transfer "the modified file"; it lists "the user

saving the file" as one such possible triggering event.  As a matter of language, then, here the

specification is telling us that prior to a "user saving" the file (i.e., the "triggering event" that results in the "transfer[]" of "the modified file")—that file is *already* a "modified file."  And if that is so, then Plaintiff's position—i.e., that modifying a file necessarily *includes* the process of saving that file—would not seem to be correct.  Indeed, other portions of the specification also suggest that modifying (e.g., editing or changing) a file is something that occurs *prior* to the file being saved.  (*See also, e.g.*, '607 patent, col. 3:24-26 (noting that in the context of a file attached to an e-mail, "[i]f the customer, for example, were to open the file, *change* it, *then save* it back out, the results would be ambiguous . . . .") (emphasis added))

Plaintiff presents two arguments for why the Court should reach a contrary conclusion. (D.I. 403 at 7-12)  Both are unavailing.

Plaintiff's first argument is that Defendant's reading of the '561 patent "fails to consider how those terms are used in the claims and how a computer functions with respect to file modification."  (*Id*. at 11-12)  Here, Plaintiff asserts that in claim 1 of the '561 patent, "modifying" encompasses saving the edited file—and that the claim's reference to a "save operation" is merely meant to specify "*how* it is known that the file has been modified."  (*Id*. at 12 (emphasis in original))  To this end, Plaintiff suggests that the second application of the claimed system could figure out that a file has been modified in "various [other] ways" other than looking to whether a "save operation" has been performed—such as by "the operating system . . . inform[ing] the second application of the modification by sending it a notification that the file has been modified."  (*Id*.)  Plaintiff argues, then, that this portion of the claim is simply meant to require that the second application must figure out that file modification has occurred by recognizing that a save operation has been performed on the file.  (*Id*.; Tr. at 186-87)

In this paragraph of its briefing, however, Plaintiff cited to no portion of the '561 patent or the patents-in-suit in support of the above-referenced position.  (D.I. 403 at 11-12)  And contrary to Plaintiff's suggestion, claim 1 of the '561 patent does not state that the second application looks for the occurrence of a "save operation" in order to figure out that *a file has been modified*; instead, the claim states that the application uses the occurrence of a "save operation" as a trigger that tells it *that it needs to automatically transfer a copy of the (already modified) file to another device.*

Plaintiff's second argument is that a person of ordinary skill in the art ("POSITA") would understand that modification as a whole constitutes "editing the content of the file *and* saving that edited content to persistent storage."  (*Id*. at 8 (emphasis in original))  In support of this argument, Plaintiff cites to a few pieces of evidence; perhaps most prominent is its citation to a portion of a declaration from its infringement expert, Prashant Shenoy, Ph.D.  (*Id*. (citing D.I. 364, ex. 20 ("Shenoy Decl.") at ¶¶ 55-56))[8]

---

[8]    Plaintiff also cites to three other pieces of evidence in this portion of its answering brief:  (1) the purported definition of "file" in the *Microsoft Computer Dictionary, Fifth Edition*, (D.I. 364, ex. 39); (2) deposition testimony of Defendant's engineer, Artur Sobierak (from a deposition held on June 10-11, 2024), (*id*., ex. 23 at 166); and (3) its Exhibit 63 (which appears to be a copy of Defendant's initial disclosures), (D.I. 431, ex. 63).  (D.I. 403 at 8 (citing to these exhibits in support))  These citations too are not helpful to its cause (and relatedly, this portion of Plaintiff's brief appears to be filled with mistakes).

Turning first to the purported dictionary definition, Plaintiff did not even do enough to permit the Court to assess it.  The three-page excerpt for the *Microsoft Computer Dictionary, Fifth Edition* that Plaintiff provided as an exhibit simply does not include the definition for the word "file."  (D.I. 364, ex. 39 (*cited in* D.I. 403 at 8))  Indeed, the Court attempted to find that exact dictionary online, and so far as it could tell, the actual definition of "file" in the cited dictionary is *different* than the definition that Plaintiff included in its answering brief. *Microsoft Computer Dictionary*, 211 (5th Ed. 2002) (defining "file" as a noun meaning "[a] complete, named collection of information, such as a program, a set of data used by a program, or a user-created document.  A file is the basic unit of storage that enables a computer to distinguish one set of information from another.  A file is the 'glue' that binds a conglomeration of instructions, numbers, words, or images into a coherent unit that a user can retrieve, change,

In the cited portion of his declaration, Dr. Shenoy opines that a "file" is "a uniquely named collection of program instructions or data stored on a hard drive, disk, or other storage medium and treated as a single entity[,]" and then asserts that a POSITA would understand that "in the context of a file, . . . a modified file is only generated when a file is edited *and* saved to persistent storage." (Shenoy Decl. at ¶¶ 55-56 (internal quotation marks omitted, emphasis in original)) But the Court has been provided with no indication of where Dr. Shenoy actually obtained this asserted definition of "file." *See also supra* n.8. And Dr. Shenoy cited to no authority in support of his statement that "a modified file is only generated when a file is edited *and* saved to persistent storage"; he simply states that conclusion, baldly. (Shenoy Decl. at ¶¶ 55-56 (emphasis in original)) It is well settled that "extrinsic evidence may never be used for 'the purpose of varying or contradicting the terms of the claims'" and the specification.

---

delete, save, or send to an output device."), https://archive.org/details/microsoft-computer-dictionary-5th-edition. In any event, the point is that none of this is in the record, and the Court cannot consider evidence that wasn't properly provided to it or shared with Defendant. *I-Mab Biopharma v. Inhibrx, Inc.*, Civil Action No. 22-276-CJB, 2024 WL 5336413, at *7 n.11 (D. Del. Aug. 30, 2024).

As for the deposition testimony of Defendant's engineer, Mr. Sobierak, in the excerpt of the deposition (page 166) cited in Plaintiff's answering brief, Mr. Sobierak does *not* clearly say that modifying a file includes the act of saving the file. (*See* D.I. 364, ex. 23 at 166 (*cited in* D.I. 403 at 8)) And in any event, the engineer was testifying here about the accused product, not the claimed invention. (D.I. 423 at 8-9); *see Riddell, Inc. v. Schutt Sports, Inc.*, 724 F. Supp. 2d 981, 984 (W.D. Wis. 2010); *see also Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1330 (Fed. Cir. 2006) ("claims may not be construed with reference to the accused device[,]" so it follows that courts may not rely on the accused product "as a form of extrinsic evidence to supply [claim] limitations") (internal quotation marks and citation omitted).

Lastly, with regard to Plaintiff's Exhibit 63, that exhibit was not filed until a month after Plaintiff submitted its answering brief—and it does not contain the page numbers to which Plaintiff cites. (D.I. 431, ex. 63; *see also* D.I. 403 at 8) It may be that here Plaintiff meant to cite to its Exhibit *61* (a copy of a transcript of the deposition of Mr. Sobierak dated June 11, 2024), instead of Exhibit *63*. (*See* Plaintiff's Summary Judgment Hearing Slides, Slide 14) Even were that so, for the reason set out above, the engineer's testimony would not move the needle.

16

*Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1332 (Fed. Cir. 2001) (quoting

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 981 (Fed. Cir. 1995)); *see also Vitronics*

*Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996) (same).  Here, because Dr.

Shenoy makes no attempt to connect his reading of the claims to the intrinsic record, and because

(as noted above) his reading is in conflict with that record, the Court cannot credit his opinion in

this regard.  *See SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1210 (Fed. Cir. 2013) (finding

that expert testimony deserved no weight where it conflicted with the plain language of the

claims and "lack[ed] any substantive explanation tied to the intrinsic record").  Indeed, since this

dispute can be resolved by way of reference to the language of the patent claims and the

specification, the Court need not even consider Dr. Shenoy's opinion at all.  *See MyPAQ*

*Holdings Ltd. v. Samsung Elecs. Co.*, 2023-2024, 2023-2025, 2025 WL 1189920, at \*4 (Fed. Cir.

Apr. 24, 2025); *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706

(Fed. Cir. 1997).  As Defendant puts it, Plaintiff must "live with its claims as written."  (D.I. 423

at 8)

Therefore, for all the reasons set out above, the Court concludes that "modifying a

content" shall be construed to mean "editing content of the file, which does not involve saving

the file."

### B.    Infringement

With claim construction settled, the Court now turns to the issue of infringement.

Defendant's argument for non-infringement is that:  (1) the asserted claims require that the

automatic synchronization process must be initiated "responsive to the user modifying a content"

of a file; (2) pursuant to the Court's claim constructions, this means that when the user is simply

"editing content of the file" (i.e., not saving those edits), *that act* must be the "initial triggering

event" for the beginning of the synchronization process; (3) there is no evidence that the accused products begin the synchronization process when the user modifies or edits a file on the device; and (4) instead, the evidence establishes that the accused products do not start the synchronization process until the user edits, *saves* and *closes* the file. (D.I. 352 at 12-17)  For Plaintiff's part, it disagrees with the fourth prong of Defendant's infringement analysis—in the sense that it believes that the accused products' synchronization process can begin when a file is *saved*, not necessarily only when a file is *closed*. (D.I. 403 at 10-11)  To that end, Plaintiff maintains that the accused devices trigger the synchronization process in either of two ways: "(1) the changes made to the content of the file are saved even when the file remains open . . . ; or (2) the changes made to the content of the file are saved and the file is closed on the first client device." (*Id*. at 10 (citing D.I. 405, exs. 48-52))

But the bigger point here for the infringement issue before the Court is that Plaintiff does *not* dispute that all of the evidence shows that the accused products do not trigger synchronization until at least "when changes to the content of the file are *saved*[.]" (*Id*. (emphasis added); *see also* Tr. at 158-59; D.I. 363, ex. 10 at ¶¶ 145-55; *id*., ex. 19 at 160-61, 164, 185-86, 193; *id*., ex. 20 at 155-58, 164; *id*., ex. 24 at 145; D.I. 405, ex. 52 (Dr. Shenoy running multiple tests to demonstrate that Defendant's accused products begin synchronization after the file is saved))

That admission ends the infringement inquiry.  Again—and turning back to what the claims require—there can be no infringement unless the file is "automatically received from the first client device responsive to the user modifying a content of the first file[,]" ('607 patent, 10:64-66)—i.e., the "condition of the user modifying a content [is] an initial triggering event for [the] corresponding recited action[,]" (D.I. 259). (*See also* D.I. 243 ("By the end of the

18

*Markman* hearing, both parties agreed that modification of the file by the user was the only triggering event that initiates the start of the file synchronization process.") (citations omitted)) So since the record establishes that the accused products do *not* begin the synchronization process when the file is *modified*—and instead, at a minimum, only do so when any modifications are *saved*—then there can be no infringement here.  (Tr. at 143; D.I. 403 at 11 (Plaintiff claiming that there is a genuine dispute of material fact as to the infringement inquiry because "the [a]ccused [p]roducts initiate synchronization when the user modifies the content of the file, i.e., saves the changed content to persistent storage[ even if] the file remains open"); Defendant's Summary Judgment Hearing Slides, Slide 33)

IV.    **CONCLUSION**

    For the foregoing reasons, the Court concludes that the accused products do not infringe any of the patents-in-suit.  It thus GRANTS Defendant's Motion.  An appropriate Order will issue.

    By no later than **July 14, 2025**, the parties shall provide the Court with a joint status report indicating:  (1) what more, if anything, the Court needs to address regarding this litigation in light of its decision herein; and (2) whether there is any reason why, in light of its decision herein, the Court should not vacate the pre-trial conference and trial dates (as it now intends to do).